The STATE ex rel. MONTGOMERY, Atty. Gen., Appellee,

v.

PAKRATS MOTORCYCLE CLUB, INC., Appellant.

[Cite as *State ex rel. Montgomery v. Pakrats Motorcycle Club, Inc.* (1997), 118 Ohio App.3d 458.]

Court of Appeals of Ohio,
Ninth District, Wayne County.

Nos. 96CA0020 and 96CA0035.

Decided Feb. 26, 1997.

*Betty D. Montgomery*, Attorney General, and *Karen Lawson*, Assistant Attorney General; *Keith Shearer*, Wayne County Prosecuting Attorney, and *Martin Frantz*, Assistant Prosecuting Attorney, for appellee.

*Corina Staehle Gaffney*, for appellant.

REECE, Judge.

Appellant Pakrats Motorcycle Club, Inc. appeals the decision of the Wayne County Court of Common Pleas finding the Pakrats' annual "Pakrat Swap Meet

and Party" to be a nuisance, and perpetually enjoining the Pakrats from promoting and maintaining the "Pakrat Swap Meet and Party." We affirm.

The Pakrats Motorcycle Club, Inc. is an association of motorcycle enthusiasts based in Orrville, Ohio. Every summer, beginning in 1980 and continuing through 1995, the Pakrats hosted the three-day "Pakrat Swap Meet and Party," where motorcycle enthusiasts from around the country gathered to "party" and trade in motorcycle parts. The Pakrats distributed handbills promoting the event as "the best party in the USA." The event was open to the public, and attendees paid a $20 fee for admission. The Pakrats held the swap meet and party on the one-hundred-twenty-acre farm of Louis and Debby Rehm, located at 5166 Tannerville Road in Orrville. The swap meet and party featured live bands, food, vendors of motorcycle parts, and activities for the entertainment of the attendees. Both men and women attended the event, often with children in tow. In 1995, attendance at the event numbered between four thousand two hundred and eight thousand people.

Over the course of the event's fourteen-year existence, Orrville residents became increasingly bothered by it and the negative effects it had on the community. The citizens complained about excessive noise, public sexual activity and immoral behavior at the event, damage to neighbors' property by party attendees, and crimes perpetrated in the community by attendees. The Wayne County Sheriff's Department also became concerned about its ability to control the behavior of the partygoers due to the size of the event and the wild and disruptive behavior that accompanied it. The department sought the assistance of the Ohio Bureau of Criminal Investigation to examine the activities taking place at the annual swap meet and party. Undercover agents from the BCI posed as t-shirt vendors at both the 1994 and 1995 events. They documented their observations with written reports, as well as still photographs and video-tape.

On October 19, 1995, the state of Ohio brought a nuisance action against the Pakrats, seeking to enjoin the Pakrats from maintaining the swap meet and party at 5166 Tannerville Road or anywhere in the state of Ohio. A hearing was held in the matter on October 26 and 27, 1995. Evidence regarding the nature of the event was presented by the BCI agents, a captain from the Wayne County Sheriff's Department and several Orrville residents.

The agents testified that they observed party attendees walking around fully or partially naked throughout the three-day duration of the event. Attendees displayed their bodies and engaged in sex acts out in the open. Such displays often occurred in the vicinity of children. One agent testified to an incident when a man and two women approached the agents' t-shirt booth and the women lifted

up their dresses. The man then performed oral sex on both of the women in front of the agent. The agent documented this occurrence with photographs.

In addition to describing the still photographs, the agents testified about occurrences they videotaped at the event. One agent testified that he viewed a couple, in broad daylight, engaging in sexual activity on the top of a trailer. The video showed the woman, partially naked, performing oral sex on her male companion. According to the agents, occurrences such as these were commonplace.

The videotape further documented the reputed highlight of the party, the annual "titty contest." The "titty contest," which the Pakrats extolled on promotional fliers during the early years of event, was a contest where nude women paraded on the stage and the audience rated the attractiveness of their breasts through applause. The tape revealed a master of ceremonies who presided over the contest and encouraged the contestants to place their breasts in a cardboard "titty meter" in order to provide a standard for size comparison. One of the agents testified that there was a tie between two contestants at the 1995 event which the M.C. resolved by having both of the finalists insert a band member's drumstick into their vaginas. The individual who inserted the drumstick farthest won the contest. All of this activity occurred on stage underneath a banner reading "Welcome Pakrats 15th Swap Party." The agent's testimony further revealed that children were present at the contest. The videotape showed a boy, approximately eleven years of age, watching the contest and taking pictures with a camera.

The stage where the contest took place and where live music was performed throughout the duration of the event was equipped with a powerful sound system. Two residents from neighboring farms testified they could hear noise from the event throughout the day and night. Both of them stated that on their respective farms they could hear the music played by the bands until the very early hours of the morning. Both further testified that they heard the M.C. announcing the "titty contest" over the sound system. One of the residents, a mother of two children, stated that even with her windows closed and her air conditioner turned on, she and her family heard the contest in detail. The same woman testified regarding damage done to her crops by party attendees who camped or frolicked in her fields.

On October 26, 1995, the Pakrats issued a press release through their attorney and announced "new rules for conduct of annual swap meet." The press release read:

"It has come to the attention of The Pakrats Motorcycle Club, Inc., the host organization of an annual swap meet and party held in Orrville each June, that

certain isolated incidents of alleged lewd and nude behavior have existed at past events.

" * * *

"Pakrats President William F. Gadfield said, 'The focus of the Swap Meet has always been about Motorcycle enthusiasts getting together to share camaraderie with like-minded people and selling their products. Over the years we have resolved to maintain a fun and safe environment at this event that all can enjoy.' "

This press release was filed with the trial court.

On November 20, 1995, Louis and Debby Rehm acknowledged that a nuisance existed on their property, and the trial court perpetually enjoined them from maintaining a nuisance on their property or elsewhere. The court then dismissed the Rehms from the action.

A permanent injunction hearing was held on January 9, 1996. On February 23, 1996, the trial court ruled that the swap meet and party was a nuisance and should be enjoined. The court then released a judgment entry on April 5, 1996, permanently enjoining the Pakrats from maintaining and promoting the "Pakrat Swap Meet and Party" in Wayne County or anywhere in the state of Ohio. This appeal followed.

The Pakrats offer six assignments of error for our review. We will address each assignment of error individually.

I

"The trial court erred in finding that a nuisance existed at the site of the 'Pakrat Swap Meet and Party.' "

The trial court found that lewd behavior occurred at the Pakrats' swap meet and party sufficient to render the event a nuisance under R.C. Chapter 3767. R.C. 3767.01(C) defines nuisance as "any place in or upon which lewdness, assignation, or prostitution is conducted, permitted, continued, or exists." The statute provides that injunctive relief may be sought against anyone who "uses, occupies, establishes, or conducts a nuisance, or aids or abets therein." R.C. 3767.02. The Pakrats contend that their annual swap meet and party was not a place where lewd behavior occurred and thus did not constitute a nuisance within the meaning of R.C. Chapter 3767. We disagree.

In considering this nuisance statute, the Ohio Supreme Court expounded upon the meaning of lewdness in *State ex rel. Rear Door Bookstore v. Tenth Dist. Court of Appeals* (1992), 63 Ohio St.3d 354, 588 N.E.2d 116. The court cited the Webster Dictionary's definition of lewd: "sexually unchaste or licentious * * * lascivious * * * inciting to sensual desire or imagination." The court further

stated that "lewdness" refers to "public sexual activity that is reprehensible or disgusting in nature." *Id.* at 360, 588 N.E.2d at 122. We find the trial court correctly determined that the behavior of the attendees at the Pakrats' party qualified as a lewd display.

The Pakrats argue that the activities at the swap meet and party did not constitute lewdness for several reasons. First, they claim that the contestants in the "titty contest" were dancing nude and that such expressive conduct is protected by the First Amendment. See *Schad v. Mt. Ephraim* (1981), 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671. The First Amendment must not be used as a "cloak for obviously unlawful public sexual conduct by the diaphanous device of attributing protected expressive attributes to that conduct." *Arcara v. Cloud Books, Inc.* (1986), 478 U.S. 697, 705, 106 S.Ct. 3172, 3176, 92 L.Ed.2d 568, 577. While some contestants did dance on stage, expressive dancing was clearly not the primary focus of the contest. Furthermore, even if the "titty contest" were protected by the First Amendment, many other public sexual acts engaged in by party attendees were not. The BCI agents testified that party attendees publicly engaged in oral sex and masturbation. Such displays can certainly be considered reprehensible and disgusting public sexual activity.

The Pakrats further assert that the event cannot be deemed a nuisance because lewd behavior occurred on a privately owned farm and thus was not public activity. For the purposes of defining lewdness under R.C. Chapter 3767, sexual activity which occurs in areas where there is no legitimate expectation of privacy is public sexual activity. *State ex rel. Roszmann v. Lions Den* (1993), 89 Ohio App.3d 775, 783, 627 N.E.2d 629, 634-635. Those who attended the swap meet and party hardly had an expectation of privacy when the event was open to anyone willing to pay the $20 admission fee. As the record shows, sex acts occurred in open areas with many people, including children, present. The individuals engaging in such sex acts had no legitimate expectation of privacy. The lewd behavior at the Pakrat party qualifies as public sexual activity under R.C. Chapter 3767.

Finally, the Pakrats maintain that the sexual activities were not lewd because they did not result in sexual arousal or gratification, but rather were intended "to incite mirth, or perhaps pique." We find this argument to be completely lacking in merit. Review of the photographs and videotape contained in the record establishes explicit sexual conduct, the very nature of which implies arousal and gratification.

The behavior at the Pakrats' annual party was sufficiently lewd to render it a nuisance under R.C. Chapter 3767. Accordingly, the Pakrats' first assignment of error is overruled.

II

"The trial court erred in enjoining appellant from holding any swap meet and/or party when it did not find that appellant had knowledge of the activity constituting a nuisance, and either used, occupied, established or conducted the nuisance or aided or abetted another in such activity."

The Pakrats charge that the state presented no evidence that the Pakrats "had any knowledge, participated, or acquiesced in any of the allegedly lewd conduct which occurred at the swap meets in 1994 and 1995," and thereby failed to prove an essential element of their nuisance claim. This contention is without merit.

■ A plaintiff in a nuisance action is required to establish that the person or entity enjoined knew of, and participated in or acquiesced in the activities constituting the nuisance. *State ex rel. Freeman v. Pierce* (1991), 61 Ohio App.3d 663, 670–671, 573 N.E.2d 747, 751–753. This may be established by direct evidence or by proof of the general reputation of the place where the nuisance is alleged to exist. *State ex rel. Pizza v. Carter* (1993), 63 Ohio Misc.2d 235, 240, 622 N.E.2d 1194, 1197–1198. Review of the record confirms that the state presented both direct and reputation evidence of the Pakrats' knowledge of and participation in lewd activities constituting a nuisance.

■ The record contains an abundance of evidence indicating Pakrat knowledge of and participation in the swap meet and party. Both the videotape and still photographic evidence reveal banners on the stage emblazoned with the Pakrats' name. The record further includes promotional handbills for the event indicating the Pakrats' sponsorship of the event, as well as a national motorcycle magazine featuring an article about the event and attributing all credit to the Pakrats. The best evidence of the Pakrats' knowledge and participation is the press release it issued on October 26, 1995, the first day of the trial court's hearing in this matter. In the release, the Pakrats and their president, William Gadfield, acknowledged that the Pakrats were the "host organization" of the event. Additionally, the state presented evidence of the Pakrats' reputation as hosts of the annual event. Several Orrville citizens testified to the general belief held by the community that the Pakrats are responsible for the annual event.

Because the Pakrats are sponsors of the swap meet and party, the Pakrats' knowledge of and participation in the event are implicit. Therefore the Pakrats' second assignment of error is overruled.

III

"The decision of the trial court in finding a nuisance was against the manifest weight of the evidence."

In determining whether a trial court's decision was against the manifest weight of the evidence, this court must follow the standard set forth in the syllabus of *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578: "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." See, also, *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 410–411, 461 N.E.2d 1273, 1276–1277; *Chemical Bank of New York v. Neman* (1990), 52 Ohio St.3d 204, 207–208, 556 N.E.2d 490, 493–495; *Vogel v. Wells* (1991), 57 Ohio St.3d 91, 96, 566 N.E.2d 154, 158–159. Absent extreme circumstances, an appellate court will not second guess determinations of weight and credibility. *Sykes Constr. Co., Inc. v. Martell* (Jan. 8, 1992), Summit App. Nos. 15034 and 15038, unreported, at 19, 1992 WL 2919.

Granting an injunction is within the sound discretion of the trial court and depends upon the facts and circumstances surrounding the case. *Akron v. Kettering* (1995), 106 Ohio App.3d 547, 549, 666 N.E.2d 615, 616–617. In determining whether an abuse of discretion exists, a reviewing court should be guided by a presumption that the trial court was correct. *In re Jane Doe 1* (1991), 57 Ohio St.3d 135, 138, 566 N.E.2d 1181, 1184–1185. "Abuse of discretion" connotes more than an error of law or judgment as it implies the court's attitude is unreasonable, arbitrary or unconscionable. *Steiner v. Custer* (1940), 137 Ohio St. 448, 451, 19 O.O. 148, 149, 31 N.E.2d 855, 856–857; *Cedar Bay Constr., Inc. v. Fremont* (1990), 50 Ohio St.3d 19, 22, 552 N.E.2d 202, 205–206.

This court finds the trial court did not abuse its discretion in holding that the public sexual activity at the Pakrats' annual swap meet and party was lewd behavior and that thus the event should be enjoined. The record confirms that competent, credible evidence exists to support this determination. Consequently, we find that the trial court's decision was not against the manifest weight of the evidence. The Pakrats' third assignment of error is overruled.

## IV

"Insofar as R.C. 3767.01, *et seq.* allows for a finding of a nuisance based on lewdness it is vague and overbroad, and therefore unconstitutional on its face and as applied."

The Pakrats argue that R.C. 3767.01, based upon its incorporation of the term "lewdness," is vague and overbroad and therefore unconstitutional. The Ohio Supreme Court resolved the issue of vagueness in *State ex rel. Rear Door Bookstore*, 63 Ohio St.3d 354, 588 N.E.2d 116. The Supreme Court stated:

■■ "[The concept of vagueness] implies that a statute must be written so that a man of common intelligence can ascertain what conduct is prohibited, and that the law must provide sufficient standards to prevent arbitrary and discriminatory enforcement. *Connally v. General Construction Co.* (1926), 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322; *Coates v. City of Cincinnati* (1971), 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214; *Papachristou v. City of Jacksonville* (1972), 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110.

■■■ "However, a statute is not void for vagueness merely because it could have been more precisely worded. *Roth v. United States* (1957), 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498. The legislature need not define every word of a statute. Words of ordinary usage will be given the meaning commonly attributed to them. *State v. Loless* (1986), 31 Ohio App.3d 5, 31 OBR 19, 507 N.E.2d 1140, citing *State v. Dorso* (1983), 4 Ohio St.3d 60, 4 OBR 150, 446 N.E.2d 449. Mathematical certainty is not required. ' * * * The test is whether the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. * * *' *Jordan v. De George* (1951), 341 U.S. 223, at 231–232, 71 S.Ct. 703, at 708, 95 L.Ed. 886, at 892." *Rear Door Bookstore,* 63 Ohio St.3d at 358, 588 N.E.2d at 120–121.

The court further stated:

"The common definitions of 'lewd' clearly demonstrate that there are activities of a sexual nature which are beyond the limits of what society deems tolerable. We recognize this proposition is tempered by an established right of privacy which generally provides that what two consenting adults do in private is their own concern. *Paris Adult Theatre I v. Slaton,* [ (1973), 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446]. By necessary implication, R.C. 3767.01 may only be applied to instances of public activity which are unprotected. * * *

■■ "In summary, we conclude that the term 'lewdness' is not void for vagueness. The word describes a public sexual activity that is reprehensible or disgusting in nature. Its meaning is sufficiently clear to a person of average intelligence and its definition supplies ample guidance to prevent arbitrary and discriminatory enforcement." *Id.* at 360, 588 N.E.2d at 122.

■■ The Ohio Supreme Court addressed the question of overbreadth with regard to R.C. Chapter 3767 in *Rear Door Bookstore* as well. The doctrine of overbreadth permits a facial challenge of a statute and applies in instances where "the challenged law would have a 'chilling effect' on constitutionally protected freedoms of speech." *Id.* at 357, 588 N.E.2d at 120, citing *Dombrowski v. Pfister* (1965), 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22. A statute that places a substantial prior restraint on free speech may not be enforced unless it is tailored to prohibit only unprotected activity. *Brockett v. Spokane Arcades, Inc.* (1985),

472 U.S. 491, 105 S.Ct. 2794, 86 L.Ed.2d 394. In *Rear Door Bookstore*, sexual activity occurring on the premises of a bookstore was not considered to be protected by the First Amendment. Therefore, the court found the doctrine of overbreadth inapplicable in that case. *Rear Door Bookstore*, 63 Ohio St.3d at 358, 588 N.E.2d at 120–121.

Similarly, in the case *sub judice*, we do not find the public sex acts which took place at the Pakrat parties to be activity protected under the First Amendment. Thus, R.C. Chapter 3767 is not overbroad with respect to its application in this case.

Because no syllabus exists in the case, the Pakrats contend that the *Rear Door Bookstore* case is not binding precedent upon this court. They assert that because the Supreme Court did not issue a separate opinion, but instead adopted the decision of the Tenth District Court of Appeals, this court is not obligated to follow the holding of that case. We disagree. The points of law are contained within the text of this opinion, just as they are in a *per curiam* opinion. See S.Ct.R.Rep.Op. 1(C). The decision of the Supreme Court in *Rear Door Bookstore* is binding precedent upon the lower courts of this state, and this court will follow the holdings contained therein.

R.C. Chapter 3767 is neither vague nor overbroad. The Pakrats' fourth assignment of error is overruled.

## V

"The injunction granted by the trial court is a prior restraint on constitutionally protected conduct, and is therefore overbroad and unconstitutional."

We decline consideration of the Pakrats' fifth assignment of error because our resolution of the fourth assignment of error renders consideration unnecessary. See App.R. 12(A)(1)(c).

## VI

"The injunction issued by the trial court does not comport with Ohio R.Civ.Pro. 65(D), and thus, the decision of the trial court should be reversed."

Civ.R. 65(D) provides:

"Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in

reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding upon the parties to the action, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with them who receive actual notice of the order whether by personal service or otherwise."

The Pakrats claim that the trial court's journal entry granting the permanent injunction "in no way comports with Rule 65 in that it is not 'specific in terms,' nor does it outline the 'act or acts sought to be restrained.'" We disagree.

In a decision dated February 23, 1996, the trial court set forth its reasons for finding that the Pakrats' annual swap meet and party qualified as a nuisance. The trial court cited the evidence it relied upon in reaching the conclusion that the swap meet and party was a lewd display constituting a nuisance under R.C. Chapter 3767. On April 5, 1996, the trial court issued a judgment entry which perpetually enjoined the Pakrats from "maintaining and promoting the event that has come to be known as the 'Pakrat Swap Meet and Party' in Wayne County or anywhere in the State of Ohio." This judgment entry clearly states the act to be enjoined. Both the trial court's decision and entry are sufficiently "specific in terms." Thus the Pakrats' sixth assignment of error is overruled.

The Pakrats' six assignments of error are overruled. The judgment of the trial court perpetually enjoining the Pakrats from maintaining the "Pakrat Swap Meet and Party" in Wayne County or anywhere in the state of Ohio is affirmed.

*Judgment affirmed.*

QUILLIN, P.J., and SLABY, J., concur.