The STATE ex rel. NASAL et al.

v.

BJS NO. 2, INC. et al.■

2003-Ohio-7323.]

Court of Common Pleas of Ohio,
General Division, Miami County.

No. 03–CV–287.

Decided Oct. 16, 2003.

Gary Nasal, Miami County Prosecuting Attorney, and Mark W. Altier, Chief Civil Assistant Prosecuting Attorney; W. McGregor Dixon Jr., Troy Law Director, for plaintiffs.

Sirkin, Pinales, Mezibov & Schwartz, H. Louis Sirkin and Jennifer M. Kinsley, for defendants BJS No. 2, Inc., and Lucas Liakos.

Huffman, Landis & Weaks and Robert J. Huffman Jr., for defendant Hayworth, Inc.

Donenfeld, Botros, Kollin & Schulte and Michael R. Botros, for defendant Scott Conrad.

ORDER DECLARING THE CABARET PORTION OF TOTAL XPOSURE A NUISANCE, GRANTING A PERMANENT INJUNCTION, ABATEMENT, CLOSURE FOR ONE YEAR, FORFEITURE AND SALE OF CONTENTS AND PERSONAL PROPERTY, IN PART R.C. 3767.01(C)(2) and (3), 3767.05, and 3767.06

JEFFREY M. WELBAUM, Judge.

{¶ 1} On August 12, 2003, a trial to the court was heard on plaintiffs' complaint for a permanent injunction, seeking a declaration and abatement of a nuisance, an order closing the business for one year, and forfeiture and sale of the personal property used to conduct the nuisance.

{¶ 2} The defendants/respondents and their counsel, H. Louis Sirkin, Robert J. Huffman Jr., Jennifer M. Kinsley, and Michael R. Botros, attorneys at law, were present. The plaintiffs/relators were represented by Gary A. Nasal, Miami County Prosecuting Attorney, Mark W. Altier, Chief Civil Assistant Prosecuting Attorney, and W. McGregor Dixon Jr., Law Director of the city of Troy. Due to the lack of time prior to trial to allow a response to the plaintiffs' motions to dismiss the defendants' counterclaim, disposition of the motion to dismiss the counterclaim was postponed. The parties proceeded to litigate the plaintiffs'

complaint for a permanent injunction. The motions to dismiss were subsequently granted by separate orders.

{¶ 3} On September 11, the court admitted STATE'S EXHIBITS 1 through 8. On September 22, defendants Scott Conrad and Luke Liakos, and BJS No. 2, Inc. and Haworth, Inc. filed their post-hearing briefs. On that date, the plaintiff filed its post-hearing merit memorandum. On September 29, the parties filed their reply memoranda and briefs.

{¶ 4} There is nude dancing performed at the cabaret portion of Total Xposure. First, it must be said that some people find nude dancing objectionable under any circumstances. Others not only approve of nude dancing, they obviously pay to watch. It is not the court's function to decide whether the dancing at Total Xposure is morally acceptable or whether it is equivalent to a visit to the ballet or the human hog trough.

{¶ 5} It has been held by the United States Supreme Court that entertainment programs may not be prohibited solely because they display a nude human figure, and nude dancing is not without its First Amendment protection from official regulation. *Schad v. Borough of Mt. Ephraim* (1981), 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671. The court is confined to determinations based solely on the law and the facts proved at trial.

{¶ 6} Plaintiffs claim that Total Xposure is a nuisance for two reasons. First, the plaintiffs say that Total Xposure is a public nuisance under R.C. 3767.01(C)(2) due to the sexual activity that takes place on the premises. Second, the plaintiffs allege that it is a nuisance under R.C. 3767.01(C)(3) because the defendants permit, encourage, and promote the distribution of alcoholic beverages on its premises in violation of law.

{¶ 7} R.C. 3767.01(C) defines "nuisance" as:

"(1) That which is defined and declared by statute to be a nuisance;

"(2) Any place in or upon which lewdness, assignation, or prostitution is conducted, permitted, continued or exists.* * *

"(3) Any room, house, building, boat, vehicle, structure, or place where beer or intoxicating liquor is manufactured, sold, bartered, possessed, or kept in violation of law * * * or the operation of such a room, house, building, boat, structure, or place as described in division (C)(3) of this section where the operation of that place substantially interferes with public decency, sobriety, peace, and good order. * * *"

{¶ 8} The Total Xposure defendants contend that any sexual contact with the patrons was incidental to the expressions exhibited by the performers during their dancing. They say that it is therefore protected under the First Amendment. As to the second claim, the defendants say that Total Xposure is a private

club and the liquor laws do not apply. Finally, the Total Xposure defendants say that they were not aware of any nuisance at the business. It is easy to envision cases with facts where these defenses will ring true. However, the defenses proposed are clearly inapplicable to the facts of this case.

{¶ 9} As a preliminary finding, the court must first determine whether Total Xposure is a private club. Lewd behavior does not constitute a nuisance unless Total Xposure is a public place. Also, the liquor laws were not violated if Total Xposure is a private club. In resolving this issue, the seven-factor test set forth in *Tippecanoe Country Club, Inc. v. Ohio Civ. Rights Comm.* (Mar. 30, 2000), Mahoning App. No 99 CA 330, 2000 WL 341128, requires the court to consider:

(1) the genuine selectivity of the group;

(2) the membership's control over the operation of the establishment;

(3) the history of the organization;

(4) the use of the facilities by nonmembers;

(5) the club's purpose;

(6) whether the club advertises for members; and

(7) whether the club is nonprofit or for profit.

{¶ 10} From the foregoing factors, the court finds that Total Xposure is a public place and not a private club. The evidence shows that there is no genuine selectivity in admission to Total Xposure. People become "members" upon signing the agreement, giving identification, and paying a cover charge. The membership has no control over the operation of the establishment. Total Xposure is for profit. There is no history or purpose of the organization that would support a conclusion that it is legitimately a private club.

{¶ 11} The partitioned couch-dance area is also public. It is open to view at different angles from the main cabaret area. All persons paying for a couch dance have access to this area upon paying for a couch dance. For example, it has been held that an enclosed video booth of an adult bookstore is a public area. *State ex rel. Bowers v. Elida Rd. Video* (1997), 120 Ohio App.3d 78, 84, 696 N.E.2d 668.

{¶ 12} "For the purposes of defining lewdness under R.C. Chapter 3767, sexual activity that occurs in areas where there is no legitimate expectation of privacy is public sexual activity." *State ex rel. Roszmann v. Lions Den* (1993), 89 Ohio App.3d 775, 627 N.E.2d 629; *State ex rel. Montgomery v. Pakrats Motorcycle Club, Inc.* (1997), 118 Ohio App.3d 458, 693 N.E.2d 310. The announcers during EXHIBITS 1 through 8 informed the dancers and audience that the shows were being broadcasted live to thousands over the World Wide Web. The membership agreements that the customers signed included a consent that gave Total

Xposure permission to record and broadcast the patrons' images for commercial purposes. From the foregoing and the evidence described below, the court finds that the lewd behavior and unlawful sexual activity at Total Xposure are public activities.

{¶ 13} The evidence shows that the "membership" is a scheme concocted by the Total Xposure defendants in an attempt to avoid the liquor and nuisance laws. In one of the state's videotape exhibits, the announcer stated over the public-address system that Total Xposure is not governed by any local liquor laws and that alcohol will be served until closing at 4:00 a.m. EXHIBIT 3, Show 4.

{¶ 14} The next issue is whether Total Xposure is a nuisance due to lewd behavior or other unlawful sexual activity. The criminal statutes prohibit sexual activity for hire. "Sexual activity" is defined as sexual conduct or sexual contact, or both. R.C. 2907.01(C). Sexual conduct is vaginal or anal intercourse, cunnilingus, fellatio, or the insertion of anything into the vaginal or anal cavity of another. R.C. 2907.01(A). Sexual contact is touching of certain parts of the body with the intent to cause sexual arousal or gratification. R.C. 2907.01(B). A prostitute is a person who promiscuously engages in sexual activity for hire. R.C. 2907.01(D). Prostitution is engaging in sexual activity for hire. R.C. 2907.25(A). Procuring is knowingly permitting a premises under one's authority or responsibility to be used for the purpose of engaging in sexual activity for hire.

{¶ 15} "Lewd" is not defined by statute. It has been held that "lewdness" is not a legal term of art. Rather, it is a word of common usage, meaning "sexually unchaste or licentious, lascivious, inciting to sensual desire or imagination." The Ohio Supreme Court took this definition and concluded, "In summary, we conclude that the term 'lewdness' is not void for vagueness. The word describes a public sexual activity that is reprehensible or disgusting in nature." *State ex rel. Rear Door Bookstore v. Tenth Dist. Court of Appeals* (1992), 63 Ohio St.3d 354, 360, 588 N.E.2d 116.

{¶ 16} The written rules of Total Xposure that were signed by the patrons and dancers in the defense exhibits prohibit sexual contact between them. However, these rules are ruses. The actual rules are unwritten. The unwritten rules are that dancers at Total Xposure are encouraged to engage in lewd behavior and illegal sexual activity with the customers and that the customers will receive lewd behavior or illegal sexual contact with the dancers for money.

{¶ 17} April Brewer was called to testify by the plaintiffs. In exchange for her testimony, she expected some consideration concerning her four pending felony trafficking charges. Brewer was employed at Total Xposure from August 2001 until May 3, 2003. She described the overall operation of the business.

{¶ 18} Brewer described couch dancing and friction dancing at Total Xposure in exchange for money, which were ongoing until she was suspended. Couch dances are done in the partitioned area. Couch dances are where a nude or semi-nude dancer makes sexual contact with patrons for money. The dancers' breasts and vaginas make contact with the seated patrons' faces. The dancers grind or hump their vaginas on the genital areas of the patrons. Friction dances are couch dances with a specific objective. They involve the dancers' humping their vaginal areas on the seated patrons' clothed genitals with the purpose to ejaculate the patrons in exchange for money.

{¶ 19} The court watched the videotapes, EXHIBITS 1 through 8, depicting about 30 hours of feature dancers performing in the fall of 2002. Some, if not all, of the dancers are introduced as nationally known porn stars. During the performances, they would often give or sell their posters and videotapes to patrons.

{¶ 20} EXHIBITS 1 through 8 demonstrate that, overall, lewd behavior and illegal sexual activity are more prevalent than dancing at Total Xposure. The dancers routinely made sexual contacts with the customers and house dancers for money. No dancer or customer was ever reprimanded during approximately 30 hours of videotape of performances for a violation of the anti-touching rules, with one exception. On one occasion, a patron was warned by the announcer and the dancer for slapping a dollar bill onto the body of a greased dancer too hard, while patrons were being encouraged by the announcer to try to make dollar bills stick to her breasts, buttocks, torso, and groin.

{¶ 21} During most shows, it was announced what the price would be for a private dance or couch dance with that performer after the show. The announced price ranged from a set price of $30 to a price to be determined by a silent auction or to the highest bidders with bids starting at $50. (EXHIBIT 7, Shows 4 and 11, and EXHIBIT 8, Shows 6, 7, 8, and 9 as to bids and auctions.)

{¶ 22} All but one of the dancers performed "rides for five." These were announced in advance by the master of ceremonies at different times on EXHIBITS 1 through 8 as "interactive adult entertainment," "now for the interactive part of the show," "now for the interactive part of the show featuring full contact entertainment," "where else can you get molested on stage by a porn star?", "now is the time for some public humiliation and molestation," "nude interactive adult entertainment," "get crawled all over and molested," "get publicly molested," "let her do a little crawling on you," "get mildly molested," "get mildly molested by a porn star," "for $5.00 we'll put her right on top of you," "it's public molestation," and "a ride for five gets you a smile and a hard-on." It is evident that sexual contact was encouraged by the management.

{¶ 23} The defendants claim that any sexual contact with the patrons was incidental to the expressions of dancing. Nothing could be further from the truth. When the sexual contacts between the dancers and the patrons described in this decision took place, there was never any movement of the dancer to the beat of the music. All sexual contacts were during time outs from the dancing, if there was dancing near the time of the sexual activity. Most of the time, there was no dancing at all near the time of the sexual activity. Most of the time, the dancers would move down the line or around the stage performing repeated acts of sexual activity for money paid on the spot without any dancing in between.

{¶ 24} During all of the shows, the patrons were encouraged to give money to the dancers. There was always an exchange of money either immediately prior to or after a sexual contact between a performer and patron. It was announced many times that "gratuities are not only appreciated, they are expected." Regarding "rides for five," the money was paid in advance, usually to a security guard but sometimes to the performer. The announcer told the patrons to "give the money to the security guard, who will put you up there." Even the female house dancers referred to herein paid for sexual activity with the performers described herein.

{¶ 25} Defendants Scott Conrad and Luke Liakos are the owners of Total Xposure. Total Xposure is owned by BJS No. 2, Inc., which is wholly owned by Hayworth, Inc. Defendants Scott Conrad and Luke Liakos are equal shareholders in defendant BJS No. 2 Inc.

{¶ 26} Defendant Scott Conrad was at the dance area of Total Xposure during business hours between three to five times a week while dancers where present. Defendant Luke Liakos was there at such times between one and three times a week while dancers were present. The lewd behavior and illegal sexual activity at Total Xposure were methodical, constant, and rampant to the point that they were clearly known, condoned, acquiesced in, and institutionalized by the owners. The evidence shows by clear-and-convincing evidence that the owners and managers under the owners' control knowingly permitted, encouraged, and facilitated illegal sexual activity, including lewd behavior in the ordinary course of business at the premises in violation of law.

{¶ 27} STATE'S EXHIBITS 1 through 8 depict a myriad of lewd behavior and illegal sexual activity, including sexual contact between dancers and patrons in exchange for money. They are telling.

{¶ 28} These videotapes reveal that the testimony of April Brewer drastically understates the nature and frequency of the sexual contacts and lewd behavior between the performers and the customers. She was the disc jockey and announcer during approximately half of the shows depicted on the videotapes. In most respects, EXHIBITS 1 through 8 undermine her credibility as a witness.

The exhibits and her overall testimony cause the court to conclude that she is biased in favor of the Total Xposure defendants.

{¶ 29} The court does not accept her exculpatory testimony in favor of the defense, as it is clearly contradicted by the videotapes. For example, when asked how frequently she saw the no-contact or no-sexual-touching rules broken, she testified, "I would say at least once every time I worked." A comparison of the exhibits' contents with her testimony illustrates the breadth of her understatement and bias.

{¶ 30} EXHIBIT 1 depicts a dancer who was nude most of the time. She did 12 shows mostly consisting of four or five songs per show. During these performances, she pulled the heads of patrons into her bare breasts about 106 separate occasions, usually rubbing and bouncing their faces between her breasts for a while. On most of these occasions, the patrons had paper currency in their mouths, which she removed by squeezing her breasts on the patron's face and the money.

{¶ 31} She humped her vaginal area on the groins of sitting patrons with her legs over their shoulders, usually while placing her breasts in their faces about six times. She left the stage to place her face in the genital areas of sitting patrons two times.

{¶ 32} This dancer performed a "ride for five" on a combination of male and female patrons approximately 48 times. In exchange for $5 paid in advance to a bouncer, she lay nude upon patrons on the stage. In the process, she performed various acts of sexual activity and contacts upon patrons. Her usual routine was to rub her breasts on the patrons' faces, then crawl into an inverted position with her vagina on the patrons' faces and her head on the patrons' genital areas.

{¶ 33} About half the time, she put folded currency on the patrons' faces, squatted on their faces, and somehow picked up the money with the underside of her crotch. During this process, her vagina and lower buttocks made contact with the patrons' faces.

{¶ 34} There were other miscellaneous sexual contacts between patrons and this nude dancer. One patron sponged her breasts and other parts in a kiddie bath for $5. Another female house dancer patron paid $5 to this performing dancer to have the performing dancer lick whipped cream and cherries off her breasts about five times. There were other sexual contacts that do not fit into any easily defined categories.

{¶ 35} EXHIBIT 2 depicted a second dancer's performances of 12 shows consisting of between five and nine songs each. During these shows, she pulled the heads of patrons into her bare breasts about 70 separate occasions, usually rubbing and holding their faces between the bare skin of her breasts for a while.

On many of these occasions, the patrons held paper currency in their mouths, which she removed by squeezing the patron's face and the money with her breasts.

{¶ 36} She placed her legs over their shoulders of sitting patrons, and pulled their faces into her vaginal area about four times. She partially left the stage to place her face in the genital areas of sitting patrons about 22 times. This dancer left the stage to place the genital area of a sitting patron between her legs and hump it or pull his or her face into her buttocks with her arms or legs about six times. She placed her face in the breasts of a female patron. The performer lifted the dress of a scantily dressed house dancer standing next to the stage and simulated performing oral sex on her under a skirt. She fondled the breasts of a standing female house dancer. On another occasion, the performer placed her face on the bare breasts of female house dancers.

{¶ 37} This dancer performed a "ride for five" on a combination of male and female patrons approximately 67 times. In exchange for $5, this nude dancer lay on top of patrons on the stage and engaged in various sexual contacts. Her usual routine was to rub her breasts on the patrons' faces, then crawl into an inverted position while rubbing her breasts on the torsos of the patrons' bodies. Often she would pull the shirt of the patrons up to make contact between her breasts and the patrons' skin. She always placed her vagina on the patrons' faces and her head on his or her genital areas. Many times while in this position, she would simulate giving the patrons oral sex. She usually placed her hands on the patrons' groins and often placed her hand inside the pants of the patrons in the genital areas by unzipping their pants and reaching into the top of the patrons' underwear. Sometimes she put folded currency on the patrons' faces, squatted on their faces, and somehow picked up the currency with the underside of her crotch. In the process, contact was made with the patrons' faces. In all rides for five, the dancer made contact with her genitals or the upper interior of her vaginal area with the patrons' faces.

{¶ 38} Several female house dancers and civilian females paid $5 to this performing dancer for a "ride for five" about 17 times. The performing dancer performed various sexual acts on the other females that included fondling of the other females' naked genitals and breasts, humping her vagina against their genitals, and simulated oral sex upon them. On some occasions, the performer kissed or sucked the bare breasts and nipples of the paying females.

{¶ 39} There were other miscellaneous sexual contacts between patrons and this nude dancer. For $5 one patron sponged what was represented to be motor oil off her breasts and other parts of the dancer's body in a kiddie pool. Another patron paid $5 to sponge-bath the nude dancer's breasts and buttocks. Another patron paid the set price of $20 to paint her breasts and body. Then the dancer

lay on him with her vagina near his face, to transfer the paint to a T-shirt that he wore.

{¶ 40} Other patrons were humped "doggie style" on the patrons' bare buttocks. Several patrons' bottoms were repeatedly, nonviolently, struck by the performer with a whip.

{¶ 41} EXHIBIT 3 depicts a third dancer's performances of 12 shows consisting of between four and six songs each. She was nude almost all of the time. During these shows, the performer pulled the heads of patrons into her bare breasts or rubbed her nipples across their faces on about 171 separate occasions. During many of these, the patrons held paper currency in their mouths, which she removed by squeezing the patron's face and the money with her breasts.

{¶ 42} She left the stage and humped her vaginal area on the groins of sitting patrons with her legs over their shoulders, while sometimes placing her breasts in their faces, about 16 times. She left the stage to place her face in the genital areas of two sitting patrons.

{¶ 43} This dancer performed a "ride for five" on a combination of male and female patrons approximately 66 times. Her usual routine was to rub her breasts on the patrons' faces, then crawl into an inverted position with her vagina on the patrons' faces and her head on his or her genital areas. She often pulled up the patrons' shirts or blouses and rubbed her breasts on the stomachs or chests of the patrons, making skin-to-skin contact. Often during these times, she would either kiss, suck, or blow on the stomach skin of the patrons. On one occasion, the patron was a house dancer who paid $5 and was also nude. The dancer's vagina was on or near the patron's face and vice versa.

{¶ 44} There were other miscellaneous sexual contacts between patrons and this nude dancer. One patron sponged her breasts and other parts in a kiddie bath for $5. A female house dancer paid $5 to this performing dancer to have the performing dancer lick whipped cream and cherries off the former's breasts about five times. There were other miscellaneous sexual contacts.

{¶ 45} EXHIBIT 4 depicts a dancer who did 12 shows consisting of between four and six songs per show primarily in the nude. During these shows, she pulled the heads of patrons into her bare breasts on about 183 separate occasions, usually rubbing and bouncing their faces between her breasts for a while. During most of these, the patrons held paper currency in their mouths, which she took by squeezing the patrons' faces and the money with her breasts.

{¶ 46} She rubbed her hands on the groins of sitting or standing male and female patrons about six times and humped her groin on the genital area of a sitting patron one time. She placed the heads of patrons between her legs with her legs over their shoulders and held them to her buttocks or groin, often

humping them so their faces made contact with her private areas. This occurred about 20 different times.

{¶ 47} She fondled or licked the bare breasts or nipples of female house dancers or civilian females and simulated oral sex with them, making contact on their genital areas with her face. With the civilian females, she would unclothe the patrons before engaging in this activity. The house dancers usually removed their own clothing and were usually nude during this sexual activity. The dancer placed her head on the unclothed or partially clothed genitals of females, sometimes under their clothes about nine times. The dancer fondled or licked the breasts or nipples of the females on about 15 separate occasions.

{¶ 48} This dancer performed a "ride for five" on a combination of male and female patrons approximately six times. Her number of "rides for five" was evidently reduced because she dedicated a significant portion of her acts to swallowing 9.5-, 12-, and 18.5-inch dildos. This was during the time slot when other performers normally would perform "rides for five."

{¶ 49} During the "rides for five," this nude dancer lay on top of patrons on the stage and engaged in various sexual contacts. Her usual routine was to rub her breasts on the patrons' faces, then crawl into an inverted position with her vagina on the patrons' faces and her head on his or her genital areas. Most of the time, she put folded currency on the patrons' faces, squatted onto the patrons' faces, and somehow picked up the currency with the underside of her buttocks and genital region. In the process, firm contact of the dancer's underside was made with the patrons' faces.

{¶ 50} There were other miscellaneous sexual contacts between patrons and this nude dancer. She pulled patrons' underwear out from their bodies and looked inside, squirted lotion inside patrons' underwear and reached her hands inside their underwear, apparently touching their genitals.

{¶ 51} EXHIBIT 5 depicts a dancer who was nude most of the time. She did 16 shows consisting of between four and eight songs per show. During these shows, she pulled the heads of patrons into her bare breasts or pulled their hands into her breasts while they gave her currency on about 154 separate occasions. During most of these times, she held their faces or hands between her breasts for a while. On most of these occasions, during this facial contact with her bare breasts, the patrons held paper currency in their mouths, which she took by squeezing the patron's faces and the money with her breasts.

{¶ 52} This dancer did not perform "rides for five." Instead, she filled that time slot by a series of vaginal gymnastics. Some constitute sexual activity. Unlike the other activities described herein, no direct payment was made in exchange for the activities described in the next two paragraphs. However, the

announcers strongly encouraged tipping both before and after these acts, and the patrons responded with payments.

{¶ 53} This included expelling golf and ping pong balls across the room from inside her vagina, lighting and smoking cigars with her vagina, blowing puffs of cigar smoke from her vagina, extinguishing multiple flaming safety match books from air blown from her vagina, expelling significant volumes of water from her vagina onto patrons, and blowing folded currency placed on her vagina into the air with gases apparently inhaled and then expelled from her vagina.

{¶ 54} Although it might be argued in the abstract that shooting water from one's vagina onto a patron is not lewd behavior, sexual contact, or sexual activity, on several occasions, it clearly was. After being doused with a large volume of water in the face at point blank range, several of the patrons spit out significant amounts of the water that had entered their mouths in the process.

{¶ 55} Similarly, although one might argue in the abstract that the lighting and smoking cigars with one's vagina might not be lewd behavior or sexual activity, when the performer sold the cigars after this and the cigars were smoked in her presence, the court concludes that lewd behavior and sexual activity took place. Likewise, it might be argued that propelling ping pong balls and golf balls across the room from inside one's vagina may not be lewd behavior or sexual activity. However, when its announced purpose is for the patrons to catch the balls in their mouths, sexual activity is clearly afoot.

{¶ 56} In direct exchange for money, she touched the breasts of female patrons with her hands. She unzipped the pants of patrons and felt crotches with her hands. She left the stage and sat on the genital area of patrons while they were seated. On three occasions, she placed her face in the crotches of prone females on stage while she lay on top of them. She pulled up their blouses and bras, rubbed her breasts on their stomachs and breasts, and rubbed her breasts on their faces.

{¶ 57} Almost every act with this dancer included patrons' playing "cooter-ball." Patrons tried to make a basket by throwing wadded up currency at a small container located in front of the performer's vagina as she was sitting on stage with her legs spread. If they made a basket, they won a poster as a prize. Patrons shot approximately between eight and 20 cooter-ball tries per act with this performer.

{¶ 58} EXHIBIT 6 depicted a sixth dancer's performance. Most of the time she performed nude during 12 shows of between four and six songs each. During these shows, she pulled the heads of patrons into her bare breasts or rubbed her nipples across their faces on about 75 separate occasions. During almost all of these, the patrons held paper currency in their mouths, which she removed by

squeezing the patrons' faces and the money with her breasts. On about five occasions, she pulled the patrons' hands between her breasts and removed the money with a similar squeezing process.

{¶ 59} She put the heads of sitting patrons between her legs by placing her legs over their shoulders, while sometimes placing her breasts in their face about seven times.

{¶ 60} This dancer performed a "ride for five" on a combination of male and female patrons approximately 56 times. She always made sexual contacts with each of the patrons during these "rides for five."

{¶ 61} This is the first dancer to conduct any of the "rides for five" with any clothing covering her vaginal area. Sometimes she had a small patch of clothing held by strings over her vagina. She was always at least topless. Her usual routine was to rub her breasts on the patrons' faces, then crawl into an inverted position with her vagina on the patrons' faces and her head on his or her genital areas. Usually she placed folded currency on their face over the nose. Then she would squat onto the patrons' faces and somehow remove the money with the underside of her vaginal buttock's region.

{¶ 62} She often pulled up the male and female patrons' shirts, sweaters, or blouses and rubbed her breasts on the stomachs or chests of the patrons, making skin-to-skin contact while her vagina was at or around their faces. Many times the females who paid for the ride for five were nude female house dancers. Approximately 14 times the dancer felt the breasts with her hands and kissed or licked the breasts of the nude female house dancers. On about two occasions she felt the breasts of clothed female civilian patrons.

{¶ 63} Patrons threw wadded up currency at a small container located between her breasts and at her vagina about 68 times while playing "hooter-ball" and "cooter-ball" as was previously described.

{¶ 64} EXHIBIT 7 depicted a seventh dancer's performances. She performed 12 shows consisting of between three and five songs each. She was nude most of the time. During these shows, she pulled the heads of patrons into her bare breasts or rubbed her nipples across their faces on about 54 separate occasions. During these, the patrons held paper currency in their mouths, which she removed by squeezing the patrons' faces and the money with her breasts.

{¶ 65} She left the stage and humped her vaginal area on the groin of sitting patrons with her legs over their shoulders, while sometimes placing her breasts in their faces about 16 times. She put her legs over the shoulders of a sitting patron one time, pulling his face into her vaginal area. She pressed the face of a patron into her buttocks in a similar manner. On two occasions when a patron won a rolled-up poster of her, she had them take it from between her legs. As

they did this she grabbed their heads and pulled them into her so their faces made firm contact with her buttocks.

{¶ 66} This dancer performed a "ride for five" on a combination of male and female patrons on approximately 47 separate occasions. She engaged in various forms of sexual contacts. Her usual routine was to rub her breasts across the patrons' faces, then crawl into an inverted position with her vagina on the patrons' faces and her head on his or her genital areas. Many times, while nude, she firmly rubbed and stroked her clitoris on the patrons' faces and noses for quite a while. Usually, she firmly rubbed the patron's genitals with her hands or breasts. She sometimes lay on the patron, face to face, and humped on their genitals with hers. She licked one of the female house dancer patron's skin from her chest to her crotch. With another she pulled the recipient's bra up exposing the breasts. She fondled the breasts of a female civilian patron over her clothing. While her vagina was over the face of two male patrons, she pulled up their shirts and kissed their stomachs.

{¶ 67} Several dancers had male and nude or semi-nude females come on stage, hold burning candles, and drip hot wax on the dancers' breasts, torsos, and vaginal areas in exchange for money. EXHIBIT 1, Show 2; EXHIBIT 2, Shows 5 and 11; EXHIBIT 8, Show 5.

■ {¶ 68} The court finds that illegal sexual activity and lewd behavior at Total Xposure are methodical, constant, and rampant, and constitute a nuisance under the definitions enacted by the Ohio General Assembly. The conduct at Total Xposure involves lewd behavior in public, dancing that involves sexual contact with paying customers, lap dancing, sexual activity for hire, and illegal alcohol sales. These acts are not protected by the First Amendment. *Arcara v. Cloud Books, Inc.* (1986), 478 U.S. 697, 106 S.Ct. 3172, 92 L.Ed.2d 568; *State ex rel. Rear Door Bookstore v. Tenth Dist. Court of Appeals,* (1992), 63 Ohio St.3d 354, 588 N.E.2d 116; *State ex rel. Montgomery v. Pakrats Motorcycle Club, Inc.* (1997), 118 Ohio App.3d 458, 693 N.E.2d 310; *State ex rel. Rothal v. Smith,* 151 Ohio App.3d 289, 2002-Ohio-7328, 783 N.E.2d 1001; *State ex rel. Miller v. Private Dancer* (1992), 83 Ohio App.3d 27, 613 N.E.2d 1066.

{¶ 69} The evidence demonstrates lewd behavior and other illegal sexual activity in violation of law. The foregoing evidence clearly and convincingly demonstrates Total Xposure to be a nuisance under R.C. Chapter 3767.

■ {¶ 70} The next issue is whether Total Xposure is a nuisance for violation of the liquor laws. The plaintiffs claim that the issue regarding whether Total Xposure is a nuisance on the basis of illegal alcohol sales is res judicata. It relies on the *Order Granting Plaintiffs' Application for Preliminary Injunction, In Part,* filed on June 9, 2003. The plaintiffs' position is incorrect.

■ {¶ 71} Res judicata does not apply, because the standard of proof was lower regarding the former proceeding. To prevail on a request for a preliminary injunction, the standard of proof is lower than for a permanent injunction. In the former proceeding, the movant must demonstrate only a likelihood of success on the merits rather than actual success on the merits. *Procter & Gamble Co. v. Stoneham* (2000), 140 Ohio App.3d 260, 747 N.E.2d 268. See, e.g., *Del–Fair, Inc. v. Seyferth* (June 6, 1981), Hamilton App. No. C–800277, 1981 WL 9765; *Daniel Constr. Co. v. Internatl. Bhd. of Electrical Workers, Local 88* (Dec. 10, 1986), Ross App. Nos. 1237 and 1243, 1986 WL 14075.

{¶ 72} The court must consider the nuisance issues relating to the sale of alcohol on the merits. The defendants say that the state liquor laws do not apply to them because Total Xposure is a private club. The court has determined that for all purposes Total Xposure is a public place and not a private club, for the reasons previously explained.

{¶ 73} Under the state liquor laws, it is unlawful to sell an alcoholic beverage without a permit. R.C. 4301.01. R.C. 4301.01 defines "sale" as "*exchange,* barter, gift, offer for sale, sale, *distribution and delivery of any kind,* and the transfer of title or possession of beer and intoxicating liquor either by constructive or actual delivery by any means or devices whatever, including the sale of beer or intoxicating liquor by means of a controlled access alcohol and beverage cabinet." (Emphasis added.)

■ {¶ 74} Total Xposure allowed persons to enter the premises with alcoholic beverages such as beer, wine, and wine coolers. The beverages were taken by an employee and stored in a cooler. If the patrons wanted to drink one of the beverages, they paid a waitress to bring it to them. The price was $1.50 for a 12–oz (or less) container, $2.50 for a 16–oz. container, $3.50 for a 22/24–oz container, and $7.50 for a 40–oz. container. If the container was a wine cooler, the charge was $1.75.

{¶ 75} When patrons left the premises, they were allowed to take any remaining unopened containers brought by that patron. Any containers of alcoholic beverages that were left by patrons were considered abandoned. The printed Total Xposure rules provided that such abandoned property would be destroyed. Actually, the employees and management sometimes drank it or took it home. The stipulated facts and evidence demonstrate that Total Xposure's procedures involve the "sale" of alcoholic beverages as defined above. Therefore the liquor laws were violated by Total Xposure and constitute a nuisance as alleged.

{¶ 76} The court finds by clear and convincing evidence that the two owner/shareholders had knowledge of and acquiesced in violation of the state liquor laws at Total Xposure. When defendants Scott Conrad and Luke Liakos were at

the dance area of Total Xposure during business hours, alcoholic beverages were being served.

{¶ 77} EXHIBITS 1 through 8 depict that the cabaret was filled with persons drinking alcoholic beverages. The defense exhibits indicate that the presence of alcoholic beverages would be permitted under an elaborate membership scheme. This entire procedure was developed by the owners and management. Obviously, they had knowledge of and acquiesced in the nuisance of illegal alcohol sales to avoid the state liquor laws.

{¶ 78} The court grants the plaintiffs' prayer for relief, in part. The court enters judgment and a declaration of a public nuisance, orders abatement of the nuisance, enjoins the continued existence of the nuisance by a permanent and perpetual injunction prohibiting the Total Xposure defendants personally, and through their agents, employees, and assigns, from maintaining a nuisance at 1615 Haworth Court, Troy, Ohio, or elsewhere; orders closure of the Total Xposure defendants' cabaret business premises for a period of one year from the date of this order; orders removal and forfeiture of all of the personal property and contents used in maintaining the nuisance from the cabaret business portion of the premises and a public sale of that personal property without an appraisal to the highest bidder for cash pursuant to R.C. 3767.06(A), and imposition of the taxes authorized by R.C. 3767.08.

{¶ 79} Therefore, the court finds and declares that the cabaret portion of Total Xposure is a public nuisance under R.C. 3767.01(C)(2) and (3). Due to the nature of the nuisance and the circumstances in maintaining the nuisance, the court finds that it is necessary to enter this abatement and closure order and order forfeiture, removal, and public sale of the personal property that was used to maintain the nuisance located at the cabaret portion of the business located at 1615 Haworth Court, Troy, Miami County, Ohio, to abate the nuisance in the future.

{¶ 80} The court permanently and perpetually enjoins the Total Xposure defendants, personally, and through their agents, employees, and assigns, from maintaining a nuisance at the above location or elsewhere. No person may occupy or use the cabaret portion of the said business location for a period of one year from the date of this judgment. R.C. 3767.05 and 3767.06.

{¶ 81} The Miami County Sheriff is ordered to enforce this order by entering upon the premises at 1615 Haworth Court, Troy, Miami County, Ohio, and locking and securing the cabaret portion of the business by padlock, or by any other reasonable and necessary means to effectuate this order and to remove all personal property and contents from the cabaret portion of the business, to be

safely held by the Miami County Sheriff until sold at a public auction for cash to the highest bidders pursuant to R.C. 3767.06(A).

{¶ 82} The court denies the plaintiffs' request for a closure order or other relief pertaining to the adult bookstore portion of the said premises. There has been no showing that the bookstore operation or that portion of the Total Xposure business at 1615 Haworth Court is a nuisance. Moreover, the plaintiffs have not overcome the First Amendment protection that shrouds the bookstore. Closure of the bookstore would be overbroad in respect to the nature of the nuisance in the cabaret portion of the business. Therefore, the bookstore portion of Total Xposure is not found or declared a nuisance and is not subject to this closure and forfeiture order. The bookstore shall not be seized or closed by the sheriff under this order, and the contents of the bookstore shall not be removed, forfeited, or sold at a public auction under this order.

{¶ 83} Also, the Total Xposure defendants, personally, and through their agents, employees, and assigns, are permanently and perpetually enjoined from maintaining a nuisance at 1615 Haworth Court, or elsewhere, as to the illegal sale of alcoholic beverages. Judgment of a nuisance is also specifically entered pursuant to R.C. 3767.05(E). It is ordered that no beer or intoxicating liquor be manufactured, sold, bartered, possessed, kept, or stored at 1615 Haworth Court, Troy, Miami County, Ohio, or any part thereof.

{¶ 84} Counsel for plaintiffs shall give notice of this order to the Division of Liquor Control, the Liquor Control Commission, and the Liquor Enforcement Division of the Department of Public Safety as required by R.C. 3767.05(E)(4).

{¶ 85} The clerk is directed to give notice of this order and judgment to the Miami County Sheriff, forthwith.

{¶ 86} IT IS SO ORDERED.

Judgment accordingly.