OPINION
{¶ 1} This case is the latest in a series of actions involving TotalXposure and Diamonds Cabaret, two adult entertainment clubs featuring nude or partially nude exotic dancers. The Plaintiffs/Appellants are: Total Exposure.Com, LTD., BJS No. 2, Inc., d.b.a. Adult Total Xposure (BJS), Planet Earth Entertainment, Inc. (Planet Earth), Luke Liakos, and Scott Conrad. Liakos and Conrad each own 50% of Total Exposure.Com. They each also own 50% of Hayworth, which, in turn, wholly owns both BJS and Planet Earth. At all times pertinent to this action, BJS operated Total Xposure, the dancing club located in Troy, Ohio. Similarly, Planet Earth operated Diamonds Cabaret (Diamonds), the dancing club located in Washington Township, Ohio.
 {¶ 2} To begin, we will briefly relate some history preceding this action. About ten years ago, Planet Earth opened Diamonds and was licensed to sell alcoholic beverages on the premises. Notably, there was public opposition to Diamonds from the time it opened. See Planet Earth Entertainment, Inc., d.b.a. Diamonds v.Ohio Liquor Control Comm. (1998), 125 Ohio App.3d 619, 628,709 N.E.2d 220 (discussing testimony of a state representative about the frustration of citizens and police, who felt Diamonds should be closed). In March, 1995, the lessor of the Diamonds' premises sought a temporary restraining order and inunction against Planet Earth on the ground that it was operating an adult entertainment facility in violation of a Washington Township zoning ordinance. See 1994-N1 Ohio Associates, L.P. v. Planet Earth Entertainment,Inc. (Dec. 15, 1995), Montgomery App. No. 15338, 1995 WL 738416 (affirming trial court's grant of writ of restitution to lessor). Although a writ of restitution was granted, Diamonds' owners solved the problem by buying the premises. Therefore, they were able to continue operating the club.
 {¶ 3} Planet Earth lost its liquor license in 1996, because female dancers had been allowed to perform at Diamonds with completely bare breasts. Planet Earth contested the action of the Liquor Control Commission, but the decision was ultimately upheld. See Planet Earth Entertainment, Inc., d.b.a. Diamonds,125 Ohio App.3d 619, 625-27.
 {¶ 4} A criminal complaint was also filed, accusing Conrad d.b.a. Planet Earth of violating Washington Township's zoning laws by allowing nude dancing at Diamonds. We reversed Conrad's conviction of that charge in 1997, because the trial court had employed an incorrect definition of "prurient interest." SeeState v. Conrad, d.b.a. Planet Earth Entertainment, Inc. (Jan 17, 1997), Montgomery App. No. 15553, 1997 WL 54668, *2.
 {¶ 5} Subsequently, in June, 1999, Planet Earth filed a complaint for injunctive relief in the United States District Court for the Southern of Ohio, Western Division, contending that Ohio's statutory scheme for liquor license revocations and administrative appeals from revocations violated substantive and procedural due process. See Planet Earth Entertainment, Inc.,d.b.a. Diamonds v. Edwards (S.D. Ohio 1999), 84 F. Supp.2d 891. In that case, the district court denied a temporary injunction, but also found that Planet Earth's action under Section 1983, Title 42, U.S. Code was not barred by the Eleventh Amendment.
 {¶ 6} In the meantime, BJS had opened Total Xposure in Troy, Ohio, in March, 1997. Like Diamonds, this club featured nude and semi-nude dancers, and raised the ire of local citizens and government officials. See BJS No. 2, Inc. v. City of Troy, Ohio
(S.D. Ohio 1999), 87 F. Supp.2d 800, 803-04. In fact, the day after Total Xposure opened, the City of Troy amended its zoning code to impose certain conditions on adult entertainment facilities. Shortly thereafter, the City also revoked BJS's permit to operate Total Xposure. Id. This matter was disputed in Miami County Common Pleas Court, where BJS lost, and in federal court, where BJS filed a complaint for declaratory and injunctive relief, alleging that the ordinance was unconstitutional on its face. Id. at 804. Ultimately, the district court found certain provisions of the zoning code unconstitutional as a prior restraint on constitutionally protected expression. Accordingly, the district court enjoined the City from requiring BJS to comply with certain provisions of the zoning code in order to obtain a new zoning permit. However, the court also refused to enjoin enforcement of a state court injunction prohibiting operation of Total Xposure without a zoning permit. In this regard, the court reasoned that the prior zoning permit was not revoked because of the new adult entertainment ordinance; instead, it was revoked because BJS had changed the use of its property without obtaining the City's approval. Id. at 818-19.
 {¶ 7} Nonetheless, despite the attempts of the City of Troy to close the club, Total Xposure continued to operate for more than six years, or until October 16, 2003, when the Miami County Common Pleas Court found that the club was a nuisance due to "methodical, constant, and rampant" illegal sexual activity and lewd behavior occurring on the premises. State ex rel Nasal v.BJS No. 2, Inc., 127 Ohio Misc. 2d 101, 2003-Ohio-7323,806 N.E.2d 208, at ¶ 68. This occurred well after the events involved in the present litigation.
 {¶ 8} In August, 2000, Liakos and Conrad also opened an adult bookstore in Huber Heights, Ohio. Huber Heights filed an action to enjoin operation of the bookstore because Liakos and Conrad had neither sought nor obtained a license from the City to operate a sexually oriented business. However, the trial court refused to grant an injunction. The court found that the ordinance violated the Fourteenth Amendment because it lacked various procedural safeguards required by due process. See Cityof Huber Heights v. Liakos, 145 Ohio App.3d 35, 40,2001-Ohio-1083, 761 N.E.2d 1083. On appeal, we agreed that the ordinance was flawed, and affirmed the trial court decision.145 Ohio App.3d at 40-50. Operation of the bookstore was ultimately enjoined in a separate action, based on a restrictive covenant that prohibited the rental, sale, or exhibition of pornographic material on the premises where the store was located. See KIRHuber Heights, L.P. v. Liakos, Montgomery App. No. 18636, 2001-Ohio-1761, 2001 WL 1388530, *1.
 {¶ 9} Needless to say, the above events generated substantial publicity and news coverage in the Miami Valley area (which includes Troy, Washington Township, Huber Heights, and Dayton, Ohio). See affidavit attached to WHIO TV motion for summary judgment, listing 111 articles about Plaintiffs that appeared between 1995 and January, 2004, in various sources such as the Dayton Daily News, the Cincinnati Enquirer, and the Associated Press.
 {¶ 10} The present lawsuit stems from events that occurred between October, 2002, and January 27, 2003. During that time, Becky Grimes was Special Projects Manager for WHIO TV/Cox Broadcasting. In October, 2002, another WHIO employee told Grimes about a tip he had received concerning possible internet sex videos being filmed in a shopping mall next to Diamonds. Allegedly, dancers from Total Xposure and Diamonds were involved in the videos.
 {¶ 11} Grimes and her news director, Julie Weindel, decided to hire Ronald Norton, a licensed private investigator, to see if he could confirm the tip. Norton subsequently located the office in the shopping mall where videos were being filmed. In October, 2002, a staff member from Norton's office also paid $19.95 to join TotalXposure.com, and recorded video of sexual intercourse and oral sex on the website. Grimes and Weindel viewed the website with investigators and observed video of what appeared to be a woman engaging in sex or simulated sex with a man. Grimes also visited the shopping center where the videos were allegedly being filmed, and found that the office was located where the WHIO source had predicted.
 {¶ 12} After further investigation, Grimes learned who owned TotalXposure (Liakos and Conrad). However, Grimes was never successful in getting Liakos to speak with her. In fact, the last time Grimes tried to contact Liakos, a woman at the Diamonds' office rudely rebuffed her. After that, Grimes did not attempt further contact.
 {¶ 13} Based on the above information, Grimes aired a broadcast on WHIO TV on November 25, 2002. The lead-in to the broadcast, by WHIO TV anchors, was as follows:
 {¶ 14} "Anchor: If you are concerned about nude dance clubs operating in your neighborhood . . . You won't believe what we've uncovered now!
 {¶ 15} "Anchor: Live Internet Sex! And as Newscenter 7's Becky Grimes uncovered. . . . The broadcast is coming from right here in the Miami Valley and going all over the world!"
 {¶ 16} This lead-in was followed by Grimes' report. During the report, Grimes began by commenting on the unhappiness of a local church and its minister about a nude adult dance club operating in Troy. Grimes went on to say:
 {¶ 17} "City officials say there's been no serious trouble at Total Xposure. But now, newscenter 7 has learned there's a lot more than dancing going on at the club. What would the pastor think about internet sex . . . broadcasting live from the Strawberry Capital . . . to the whole world?
 {¶ 18} "* * *.
 {¶ 19} "Here's the proof:
 {¶ 20} "TotalXposure-Dot-Com. . . . The club's website. Our investigator logged on and became a member. After paying a fee of $19.95 . . . He had 30 days of trial viewing. We couldn't believe our eyes!
 {¶ 21} "* * * *
 {¶ 22} "This is video of two women in what appears to be a sex act on the club's stage. The website menu has various offerings . . . Like `Mega Porno Cinema.' And there's no question about where it's happening . . . It's promoted `Gina Lynn Backstage after her live stage show at Total Xposure.' This is hardcore and you'll have to take our word for it because we can't show you what happens next! Is this legal? We showed our video to the Miami County Prosecutor.
 {¶ 23} "* * *
 {¶ 24} "Sources say most of the action is going on at Total Xposure. * * * Sources say there's a second internet sex studio connected to Diamonds Cabaret, a sister club in Washington Township. * * * The clubs and website are owned by Planet Earth Entertainment, operated by Luke Liakos and Scott Conrad. They did not return our calls. Now . . . the prosecutor will be asking questions."[1]
 {¶ 25} After this story aired, Grimes received several calls from women claiming to be dancers who had worked in Diamonds, Total Xposure, and other clubs in the Miami Valley. The women indicated that cameras were in many of the clubs and many clubs had internet sites. A part of the women's responsibilities was to appear on these sites. Grimes had conversations with several women, but they did not want to go on the air and reveal their identities.
 {¶ 26} Within a day or two after the first story, a woman named Sharon Taulbee called Grimes. Taulbee claimed to have worked in many clubs and said there was a lot of illegal sexual activity going on. Taulbee told Grimes about experiences she had at various clubs, from mistreatment, to things she thought were not legal, to dancers using illegal drugs, to underage girls being given alcohol, to clients touching dancers. In December, 2002, Grimes had about six conversations with Taulbee, and Taulbee eventually agreed to an on camera interview, in silhouette, so that her identity would be concealed. Grimes told Taulbee that she wanted to talk to her about what she had observed at Total Xposure, and also wanted to talk to her about her experiences in other clubs, specifically geared to the Internet. According to Grimes, "the general theme was that the Internet had become such an important part of doing business in the strip clubs."
 {¶ 27} Before Grimes did the interview, she was aware that Taulbee had worked only briefly at Total Xposure. She knew Taulbee went there for an interview, was auditioned and given a tour, and was asked to stay for a shift. She did not know if Taulbee had completed the shift. Grimes also knew that no one from Total Xposure had asked Taulbee to have sex, and that TotalXposure had told Taulbee the Internet activity was just dancing and chatting with customers. In addition, Grimes knew that Taulbee had never worked in the Internet room at TotalXposure.
 {¶ 28} In a deposition taken during the lawsuit, Taulbee stated that she had worked at various adult entertainment clubs in the Miami Valley area. She worked at "Pizazz" off and on for several months, including one six-month stint around 2000, for "New York, New York" for about four months, and for "Flamingo Show Club" for between one and six months. Taulbee also worked at other Dayton area clubs called "Spanky's," "The Living Room," "Sharkeys," "Excalibur," "Key West," "Cheeks," and "Baby Dolls," and for a Cincinnati dance club called "My Room." In addition, Taulbee had participated in three to five "bikini" contests at Diamonds. According to Taulbee, many girls "floated" from club to club.
 {¶ 29} Taulbee said she had told Grimes that she worked at Total Xposure for only three hours. While Taulbee was at Total Xposure, she danced on stage a couple of times, and may have done a couch dance. She also saw a dancer in the couch room having oral sex. The dancer had her vagina against a customer's face, hard contact, at the mouth area. After being at Total Xposure for three hours, Taulbee walked out after she witnessed what was going on in the couch room. She had not signed a contract because she was uncomfortable with working in the computer room. She didn't know exactly what the club was asking her to do. They did not tell her she had to have sex with people. Her impression was that they were going to have her perform sex acts with herself in front of a webcam. However, Taulbee did not see anyone perform with the webcam. When Taulbee left, she told the manager (Jason) that she was leaving because she was afraid an individual who had been stalking her would show up. Jason told her that she did not need to worry about that, and that if she changed her mind, to call him on his cell phone. Jason said she was welcome back at any time.
 {¶ 30} The second WHIO TV story was broadcast on January 30, 2003. This time, the lead-in to the story was as follows (with anchors "Jim" and "Cheryl"):
 {¶ 31} "Jim: Is live Internet sex happening backstage at a local nude dance club?
 {¶ 32} "Cheryl: Total Xposure in Troy claims it is . . . on their own website . . . and they show the x-rated video! We broke the story last fall. Now . . . a former dancer has come forward . . . to tell us even more!
 {¶ 33} "Jim: Newscenter's Becky Grimes investigates: Total Xposure Totally Exposed! We warn you . . . The subject matter may not be appropriate for children."
 {¶ 34} In the news report that immediately follows the lead-in, Grimes includes excerpts from Taulbee's taped interview. However, in the report, Grimes refers to Taulbee as "Susan" in order to shield her identity. Becky Grimes' report, as broadcast on January 30, 2003, is as follows:
 {¶ 35} "Becky: Stripping may seem like a dream job to some people with little or no education. Some dancers make a thousand dollars a week or more. But now, with live cameras inside the clubs . . . Dancers are being asked to do a lot more than dance. Club owners want sex. . . . live . . . on the internet.
 {¶ 36} "Susan: Everything just became a heyday.
 {¶ 37} "Becky: This former dancer, who will remain anonymous, said she was `encouraged' to participate.
 {¶ 38} "Susan: I made the choice not to have sexual relations with them or anybody they wanted me to . . . I don't have to. This is America.
 {¶ 39} "Becky: We first uncovered live Internet sex at Total Xposure in Troy last November. Here's our proof: Total Xposure-Dot-Com. After paying a fee of $19.95, we got 30 days of viewing. Much of it was hardcore sex. . . . caught on cameras set up all over the club. Susan say the Internet changed everything.
 {¶ 40} "Susan: The club owners loved it . . . It was like a frenzy. I don't think enough of them can get on the Internet fast enough.
 {¶ 41} "Becky: Susan just wanted to strip . . .
 {¶ 42} "Susan: I was told, you're fired! When you're actually interested in making money come and let me know. And she said, Why don't you go live on welfare and think about it!"
 {¶ 43} The news report then goes on to outline the reaction of residents of the Troy Community and officials of Troy to Total Xposure. One citizen indicates outrage at that type of activity taking place in Troy. These comments of Grimes immediately follow the citizen's reaction about Total Xposure:
 {¶ 44} "Becky: Live Internet sex is not something most citizens want as a claim to fame for Troy. Our investigation was even the subject of a Troy Council Meeting.
 {¶ 45} "Jack Carter, Troy resident: My question is, what action does the Council plan to do about it?
 {¶ 46} "Law Director: We are investigating the allegations. We don't know what's going on there.
 {¶ 47} "Becky: Yes we do! After viewing Total Xposure-Dot-Com last November . . . We took our video tape evidence to the Mayor of Troy and the Miami County Prosecutor. They told us . . . they would investigate.
 {¶ 48} "Gary Nasal [Miami County Prosecutor]: It's a matter that will require further investigation, further consultation with City officials, and the appropriate law enforcement authorities, which we will of course undertake before we announce any of our intentions with what appears to be going on at Total Xposure.
 {¶ 49} "Becky: Here's the problem: Back in 1997, Troy tried to use zoning law to stop Total Xposure from opening. . . . But a federal judge found it unconstitutional. Now Miami County officials are investigating whether live Internet sex is violating Ohio's obscenity law.
 {¶ 50} "Susan: They say, Oh, we'll investigate and then nothing ever happens. And if they really were investigating, the clubs wouldn't be as bad as they are.
 {¶ 51} "Becky: Susan's angry. She feels the clubs are turning into brothels. . . . And dancers are treated like dollar signs.
 {¶ 52} "Susan: I think as long as the owners can get away with it, they'll push the label . . . They'll push as far as they can possibly push it.
 {¶ 53} "Becky: Becky Grimes, Newscenter Seven.
 {¶ 54} "Anchor: The owners and operators of Total Xposure have declined interviews since our investigation began last fall. The Miami County Prosecutor assures us that authorities will be investigating."[2]
 {¶ 55} An affidavit from Luke Liakos also claimed that on January 30, 2003, he had seen advertisements for the story on WHIO TV Channel 7. The advertisement stated, "Live Sex being broadcast over the Internet right here in the Miami Valley. Now NewsCenter 7 has obtained an exclusive interview with a woman that worked at the club that produces the broadcasts." According to Liakos, the same advertisement contained a portion of the interview, spoken by an unidentified silhouetted female, who said, "I made the choice not to have sexual relations with them or anybody they wanted me to." Finally, the advertisement ended with this statement: "You may be shocked at what else she has to say when 7 Investigates: Total Xposure Totally Exposed. Tonight at 6 on Newscenter 7. Coverage you can count on."
 {¶ 56} Shortly after the second broadcast, Plaintiffs filed a complaint against Miami Valley Broadcasting Corporation, d.b.a. WHIO TV (WHIO TV); Cox Broadcasting, Inc. (Cox), Cox Enterprises, Inc., Becky Grimes, and various Jane and John Does. An amended complaint added Sharon Taulbee as a defendant. In the complaint, Plaintiffs alleged in count I that Defendants had committed defamation and slander per se and per quod with regard to the first broadcast. The second and third counts made the same allegations regarding the second broadcast and a transcript of the second broadcast that was posted on the WHIO TV website. In the fourth count, Plaintiffs alleged that they had been placed in a false and defamatory light due to interpretation, inducement, and innuendo. Finally, count V contained claims based on re-publication of the allegedly defamatory statements.
 {¶ 57} On September 10, 2004, WHIO TV and Becky Grimes filed a motion for partial summary judgment, based on the fact that Plaintiffs were limited purpose public figures. Subsequently, WHIO TV and Grimes filed another motion for summary judgment, claiming that Plaintiffs were limited purpose public figures and could not establish actual malice. On January 12, 2005, Cox and Cox Enterprises joined in the pending motions for summary judgment. Taulbee did not file a motion for summary judgment, nor did she join in the pending motions.
 {¶ 58} In responding to the motions for summary judgment, Plaintiffs elected not to proceed on claims related to the first broadcast. Therefore, the trial court considered only the second broadcast. After reviewing the matter, the court found that Plaintiffs were limited purpose public figures and must show actual malice. The court also observed that the only element that Defendants had placed at issue was "actual malice." In this regard, the court made two findings about Plaintiffs' failure to meet their burden of proof. First, the evidence failed to show that Grimes knew the implication or innuendo in the second broadcast would convey a defamatory meaning to a reasonable recipient. Second, the evidence did not show that Grimes had serious doubts about the false and defamatory implication and innuendo of the second broadcast. Specifically, the court held that Grimes was not subjectively aware that, by implication and innuendo, the second broadcast would be probably false when received by a reasonable viewer. Accordingly, the court granted summary judgment in favor of all Defendants other than Taulbee. After dismissing the claims against Taulbee, Plaintiffs appealed, and raise the following assignments of error:
 {¶ 59} I. The trial court erred in classifying Appellants as limited purpose public figures as a matter of law.
 {¶ 60} II. The trial court erred in holding that Appellant produced insufficient evidence of actual malice as a matter of law to overcome Appellees' motion for summary judgment.
 {¶ 61} After reviewing the record and applicable law, we find that the first assignment has no merit, and that the second assignment of error should be sustained. Accordingly, the judgment of the trial court will be affirmed in part and reversed in part, and this case will be remanded for further proceedings.
 I {¶ 62} In the first assignment of error, Plaintiffs contend that the trial court erred in finding that they are limited purpose public figures. The significance of this finding is that different levels of proof attach in defamation cases, depending on the plaintiff's status. Gertz v. Robert Welch, Inc. (1974),418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789. In Gertz, the court noted that:
 {¶ 63} "[t]hose who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures and those who hold governmental office may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth." Id.
 {¶ 64} In contrast, private persons need only show that a defendant "acted negligently in publishing or reporting facts."Talley v. WHIO TV 7 (1998), 131 Ohio App.3d 164, 169,722 N.E.2d 103. "Recklessness requires evidence that the defendant had serious doubts whether the statement was true."131 Ohio App.3d at 169-70, citing 3 Restatement of the Law 2d, Torts (1977), Section 580A, Comment h.
 {¶ 65} Typically, limited purpose public figures are those who have become public figures for a specific range of issues. To decide if a party is a limited purpose public figure, we examine an individual's participation in the controversy from which the alleged defamation arose, and decide if he or she has attained general notoriety in the community because of the participation.134 Ohio App.3d 170.
 {¶ 66} Notably, however, the Plaintiffs in the present case are not just individuals; they are also three business entities. In such a context, some courts have adopted a different test for evaluating the status of business or corporate entities. InHuntington Trust Co., N.A. v. Chubet (Nov. 10, 1998), Franklin App. No. 97APF12-1591, 1998 WL 807959, the Tenth District Court of Appeals remarked on the struggle federal and state courts had encountered when applying Gertz's limited purpose public figure test to libel cases brought by businesses, particularly large, high profile corporations. Id. at *8. The reason for this difficulty is that the Gertz test was created in the context of individual plaintiffs. Id. After noting that federal courts have applied different approaches for businesses, the Tenth District found that the most useful test was outlined in Snead v. RedlandAggregates, Inc. (C.A.5, 1993), 998 F.2d 1325. The test requires courts to weigh the following factors to decide if a business is a limited purpose public figure:
 {¶ 67} "`(1) the notoriety of the business to an average individual in areas where the business has a presence; (2) the nature of the business with respect to creating a high profile or prominence in public perception; and (3) the frequency and intensity of media scrutiny of the company.'" 1998 WL 807959, at *8, quoting from 998 F.2d at 1329.
 {¶ 68} The First District Court of Appeals has also applied the Sneed factors in a case involving a corporate plaintiff. See Worldnet Software Co. v. Gannett Satellite Info. Network,Inc. (1997), 122 Ohio App.3d 499, 508, 702 N.E.2d 149.
 {¶ 69} We agree with the approach taken by the Tenth and First Districts. Business entities often spend substantial amounts on advertising in a deliberate effort to engage public attention. They are also more generally visible in the community, and have greater access to media outlets than individuals. Obviously, this is not true of every business entity, and the determination must be made on a case-by-case basis.
 {¶ 70} After reviewing the evidence, we find that Total Exposure.Com, BJS, and Planet Earth, are unquestionably limited purpose public figures. These businesses would be notorious to average individuals in the Miami Valley area, due to their operation of the Total Exposure and Diamonds Cabaret nightclubs. Furthermore, the nature of these businesses (adult entertainment) is controversial and has a high public profile. And finally, the background of this action and the news articles attached to Defendants' motion for summary judgment, reveal that media scrutiny of these businesses has been frequent and intense. In fact, one might reasonably conclude that Plaintiffs have invited such scrutiny over the years, for the purpose of increasing their clientele and profit.
 {¶ 71} For example, Exhibit 1 to the affidavit of Peter Jenkins is a news article from the Dayton Daily News, dated March 22, 1995. The article mentions that Luke Liakos, owner of Diamonds, had escorted a Dayton Daily News reporter around Diamonds Cabaret. The article is entitled "Diamonds' Doors Open Into Fantasy," and the contact with the news media is for the obvious purpose of promoting the club. In the article, Liakos agrees with the reporter that Diamonds is a "male fantasy world."
 {¶ 72} More publicity was generated by threats that Diamonds would go "all nude" after it lost its liquor license and by reports that Diamonds had been banned from some local golf courses after participants in charity events sponsored by Diamonds had removed their clothing while golfing. Plaintiffs also received considerable publicity after opening the Total Xposure nightclub in Troy as a nude dancing club. See Ex. 58 attached to the Jenkins affidavit (a Dayton Daily News article of March 22, 1997, entitled "Nude Dancers Irk Mayor"). At one point, Plaintiffs even parked a bright pink semi-tractor trailer, painted with Total Xposure's name, next to Interstate 75 in Troy. See Ex. 61 attached to the Jenkins' affidavit (an excerpt from the Dayton Daily News, dated November 19, 1997). These are not actions of businesses that shun public attention.
 {¶ 73} Liakos and Conrad also generated considerable publicity when they circulated petitions to prohibit alcohol sales in Diamonds' own precinct and those nearby after learning that neighbors wanted to close Diamonds by voting the Diamonds' precinct "dry." See Ex. 51 to Jenkins' affidavit (a Dayton Daily News article of November 5, 1997, entitled "Voters are Diamonds' Best Friend"), and other articles discussing Diamonds' strategy, which successfully blocked attempts to vote Diamonds' precinct dry. Accordingly, the trial court correctly concluded that Total Exposure.Com, BJS, and Planet Earth were limited purpose public figures.
 {¶ 74} The next issue concerns the status of Liakos and Conrad, the individual parties who co-own these businesses. To determine the public or private status of individuals, courts have applied a three-part test that requires courts to decide: (1) that a public controversy exists; (2) that the plaintiff had a sufficiently central role in the controversy; and (3) that a nexus exists between the alleged defamation and the plaintiff's role in the controversy. Gilbert v. WNIR 100 FM (2001),142 Ohio App.3d 725, 738-739, 756 N.E.2d 1263, citing Dameron v.Washington Magazine, Inc. (C.A.D.C. 1985), 779 F.2d 736, 741. See, also, Waldbaum v. Fairchild Publications, Inc. (C.A.D.C.),627 F.2d 1287, 1296-98.
 {¶ 75} In the present case, the trial court labeled the relevant controversy as the adult entertainment industry in the Miami Valley area. Plaintiffs claim, however, that the court framed the issue too broadly. According to Plaintiffs, the issues are more correctly defined as "live Internet sex" and sexual harassment of employees. Plaintiffs also contend that they should not be treated as public figures because they did not insert themselves into these particular controversies before the alleged defamatory broadcast.
 {¶ 76} We do not think the issues can be as narrowly confined as Plaintiffs suggest. As our discussion of the factual background indicates, the present case is simply the latest in a long line of controversies over Plaintiffs' attempts to operate adult entertainment businesses in the Miami Valley area. Whether one is opposed to such activities, favors them, or is neutral, the fact remains that controversy has been ongoing on the subject since 1995, when Diamonds first opened and allowed semi-nude dancing. Liakos and Conrad unquestionably had a significant role in the controversy, as their names appear in many news articles, singly or together. As the court in Waldbaum noted,
 {¶ 77} "[t]he plaintiff either must have been purposely trying to influence the outcome or could realistically have been expected, because of his position in the controversy, to have an impact on its resolution. In undertaking this analysis, a court can look to the plaintiff's past conduct, the extent of press coverage, and the public reaction to his conduct and statements."627 F.2d at 1297-98.
 {¶ 78} After reviewing the past conduct of Liakos and Conrad, as well as the news articles and public reaction to their conduct and statements, we find that these individuals tried to impact resolution of the controversy over their operation of adult entertainment businesses in the Miami Valley. Compare Kassouf v.Cleveland Magazine City Magazines (2001), 142 Ohio App.3d 413,422, 755 N.E.2d 976 (finding the plaintiff a limited purpose public figure because his business activities thrust him into important controversies in several areas over a period of fourteen years). As was noted in Daubenmire v. Sommers,156 Ohio App.3d 322, 2004-Ohio-914, 805 N.E.2d 571, at ¶ 88, "[a] plaintiff may not escape public-figure status if he voluntarily engages in a course of conduct that invites attention and comment."
 {¶ 79} Finally, there is a definite connection between the possible public status of Liakos and Conrad in the operation of adult entertainment businesses and the alleged defamation. Whether true or not, comments alleging that the plaintiffs required their employees to have sex with them and patrons, fired employees for refusing to have sex, and operated their clubs as brothels, are clearly related to plaintiffs' operation of adult entertainment businesses in the Miami Valley area. Consequently, the trial court did not err in finding that Liakos and Conrad were limited purpose public figures.
 {¶ 80} In view of the preceding discussion, the first assignment of error is overruled.
 II {¶ 81} Because Plaintiffs were limited purpose public figures, the "actual malice" standard must be applied to their defamation claims. As we mentioned, this requires a showing, by "clear and convincing proof, that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth." Gertz, 418 U.S. 323, at 342. For purposes of ruling on summary judgment, the trial court assumed that the statements in the second broadcast were false. However, the court found that Grimes did not have knowledge that the broadcast was defamatory, nor did she have serious doubts as to the defamatory nature of the broadcast. In this regard, the court relied on statements from Grimes indicating that she understood the broadcast to refer to club owners in general, and that she further understood her references to Total Xposure to be distinct from the general references. As we mentioned before, the trial court concluded that Grimes was not subjectively aware that, by implication and innuendo, the second broadcast would be probably false when received by a reasonable viewer.
 {¶ 82} The Ohio Supreme Court has said that:
 {¶ 83} "[w]hether the evidence in the record supports a finding of actual malice is a question of law. * * * To answer this question, we are obliged to undertake an independent review of the record. * * * We may not infer the existence of actual malice from evidence of personal spite or ill will alone; rather, our focus is on the publisher's attitude toward the truth or falsity of the publication. * * * But evidence of ill will can be relevant: `"This standard requires a clear and convincing showing, which may be by circumstantial evidence, of the defendant's actual state of mind — either subjective awareness of probable falsity or actual intent to publish falsely."'" McKimmv. Ohio Elections Comm., 89 Ohio St.3d 139, 147-148,2000-Ohio-118, 729 N.E.2d 364 (emphasis in original).
 {¶ 84} McKimm was based on a cartoon that a candidate for township trustee included in a campaign brochure. The brochure showed a hand waving cash under a table and implied that an incumbent trustee (the candidate's opponent) had taken a bribe.89 Ohio St.3d at 140-41. In a hearing before the Election Commission, the candidate denied that he had intended the cartoon to suggest that his opponent had taken a bribe. Id. at 141. He also admitted that he had no evidence that his opponent had ever taken a bribe. Id.
 {¶ 85} After the Commission issued a reprimand letter to the candidate, the common pleas court affirmed. On further appeal, the court of appeals reversed, finding the evidence insufficient to establish by convincing clarity that the candidate had published the cartoon with knowledge that it was false or with reckless disregard for its falsity. Id. at 142. Ultimately, the Ohio Supreme Court disagreed, and reinstated the verdict of the common pleas court.
 {¶ 86} After discussing the law of defamation, the Ohio Supreme Court first found that the cartoon was a false statement of fact because a reasonable reader would view the illustration as a false factual assertion that the incumbent trustee had accepted cash in exchange for his vote on a project that was mentioned in the brochure. Id. at 144. In this regard, the court commented that:
 {¶ 87} "[t]he law charges the author of an allegedly defamatory statement with the meaning that the reasonable reader attaches to that statement. * * * if the law were otherwise, publishers of false statements of fact could routinely escape liability for their harmful and false assertions simply by advancing a harmless, subjective interpretation of those statements." Id. at 145.
 {¶ 88} After deciding that the cartoon was defamatory, the Ohio Supreme Court then considered whether the candidate had published the cartoon with actual malice. The court observed that the requirement of actual malice is intended to provide "essential `breathing space' for the criticism that is inevitable in free debate and crucial to our democratic system." Id. at 147. However, the court also stressed that:
 {¶ 89} "[o]n the other hand, the actual-malice standard is not an impenetrable shield for the benefit of those who engage in false speech about public figures. `[F]alse speech, even political speech, does not merit constitutional protection if the speaker knows of the falsehood or recklessly disregards the truth. `* * * `[T]he use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected. * * * Hence the knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection.'" Id. (Citations omitted.)
 {¶ 90} In the present case, Defendants claim that the trial court reached the correct conclusion on the subject of actual malice because Grimes consistently testified that she did not intend for viewers to get the impression that all the activities mentioned in the broadcast were going on at Total Xposure. Defendants also argue that Plaintiffs have improperly focused on whether a reader would view the broadcast as defamatory, rather than on Grimes' subjective intent.
 {¶ 91} When the Ohio Supreme Court discussed the issue of actual malice in McKimm, it specifically acknowledged the statement in St. Amant v. Thompson (1968), 390 U.S. 727, 731,88 S.Ct. 1323, 20 L.Ed.2d 262, that a "`defendant [must have] in fact entertained serious doubts as to the truth of his publication.'" 89 Ohio St.3d at 148 (parenthetical material added). In this regard, the Ohio Supreme Court stressed that:
 {¶ 92} "Thompson certainly requires evidence of the defendant's subjective state of mind in order to satisfy the actual-malice standard. * * * But Thompson also explicitly limits the ability of defendants to subvert the standard with self-serving testimony. `The defendant * * * cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, [or] is the product of his imagination * * *.'" Id. (Citation omitted.)
 {¶ 93} After applying these standards, the Ohio Supreme Court found in McKimm that the candidate had disseminated the cartoon "well aware of its false implication" and "had conveyed a message to the reasonable reader that he knew had no basis in fact." Among other things, the court found the candidate's testimony about his interpretation of the cartoon to be implausible. Id. at 149.
 {¶ 94} Like the candidate in McKimm, a jury could conclude that Grimes knew when she wrote the script for the WHIO-TV broadcast that she had no basis in fact for several implications that were made, and that she knew that the owners of Total Xposure had not asked Taulbee to have sex with them or with customers. In fact, Grimes knew that Taulbee had never met the owners of Total Xposure. Grimes also knew that the owners and managers of Total Xposure did not fire Taulbee for refusing to have sex with customers. Despite this knowledge, Grimes clearly implied in the broadcast that the owners and managers of Total Xposure were guilty of these acts.
 {¶ 95} As an additional matter, Grimes told Taulbee before the interview that they had to talk about Total Xposure because that is where WHIO TV's information had centered and that was the information in which Grimes was interested. In light of these facts, Grimes' assertion that the broadcast was about clubs generally could be viewed with some skepticism by a jury. Grimes' claim that she was not subjectively aware of the implication and innuendo of the broadcast could also be viewed in the same manner. And finally, we note that quarterly rating periods, which affect the amount WHIO TV can charge for advertising, coincided with the broadcasts.
 {¶ 96} Malice can be inferred "where sensationalism is sought at the expense of the truth." Perez v. Scripps-HowardBroadcasting Co. (1988), 35 Ohio St.3d 215, 220, 520 N.E.2d 198. Accordingly, after construing all justifiable inferences in Plaintiffs' favor, as is required on summary judgment, we find that the evidence presented was such that "`a reasonable jury might find that actual malice has been shown with convincing clarity.'" Varanese v. Gail (1988), 35 Ohio St.3d 78, 81,518 N.E.2d 1177, quoting from Anderson v. Liberty Lobby, Inc.
(1986), 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202.
 {¶ 97} We should stress that our comments are not intended to express any opinion on the potential merits of this case. A jury may find in favor of Plaintiffs on the malice issue, but find the Plaintiffs have little reputation to injure. All we are indicating at present is that summary judgment on the actual malice issue was incorrect, based on the record before us. Therefore, the second assignment of error has merit and is sustained.
 {¶ 98} Based on the preceding discussion, the first assignment of error is overruled, and the second assignment of error is sustained. Accordingly, the judgment of the trial court is affirmed in part, is reversed in part, and this case is remanded for further proceedings.
Wolff, J., and Grady, J., concur.
[1] The sets of periods in the quotation (". . .") are marks that WHIO TV inserted in the script of the original broadcast and do not indicate material that has been deleted from the broadcast. Where we have deleted material from our quotation of the broadcast script, we have inserted asterisks ("* * *") to indicate that content has been omitted.
[2] Again, the sets of periods in the quotation (". . .") are marks that WHIO TV inserted in the script of the original broadcast and do not indicate material that has been deleted from the broadcast. Parenthetical signs surround material that we have added.